STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 142-10-12 Vtec |
| Willowell Foundation CU | DECISION ON THE MERITS |

Samuel H. Burr appeals a decision of the Town of Monkton Development Review Board (DRB) approving, with conditions, an application by the Willowell Foundation, Inc. (Willowell) to construct a community center and related improvements on Willowell's 229.8-acre parcel on Bristol Road in Monkton, Vermont (Town). Willowell cross-appeals, challenging certain conditions placed on the approval. Andrew Higbee, Jr. and Sheryl Knauth appear as interested parties, and the Town of Monkton also appears, taking an active role in this matter.

The Court completed a site visit on the morning of January 27, 2014 immediately followed by two days of trial on January 27 and 28, 2014 at the Addison County Superior Court in Middlebury, Vermont. A third day of trial was held on February 7, 2014. Appearing at the site visit and trial were Mr. Burr and his attorney James W. Runcie, Esq.; Willowell and its attorneys Mark L. Sperry, Esq. and F. Rendol Barlow, Esq.; Ms. Knauth and her attorney Philip C. Woodward, Esq.; and Damien J. Leonard, Esq. representing the Town of Monkton. Additionally, a few other neighboring landowners were present at the site visit and testified at and observed portions of the trial.

Mr. Burr filed a pre-trial motion for summary judgment concerning the failure of all parties to produce a May 2000 decision by the Town of Monkton Planning Commission approving the subdivision that created the current Willowell lot. Mr. Burr asserted that unless Willowell produced that decision, this Court should deny Willowell's conditional use application. In an August 19, 2013 decision, we denied Mr. Burr's motion for summary judgment. We specifically concluded that in reviewing Willowell's conditional use application, this Court will conduct its review according to the Town's conditional use standards. To the

extent raised by parties in their Statements of Questions, we will also review any restrictions placed on the use of the Property that are brought to the attention of the Court.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact.

**Findings of Fact**

1. Willowell, a Vermont non-profit corporation, seeks conditional use and site plan approval for a facility to host its offices, a preschool with two classrooms, an art gallery, a multipurpose room, a library that incorporates an existing silo, a teaching kitchen, a farm stand, a farm manager/caretaker house, a relocated barn, a goat shed, two hoop houses, and a related access drive and parking (the Project). The Project is proposed on a 229.8-acre parcel of land identified as Lot 6 of the Perry Flint & Hartshell Co. Subdivision in Monkton, Vermont (the Property).

2. The Property is located on the east side of Bristol Road.

3. The original barn, part of which is proposed for relocation on the Property, was of a size similar to the Project's main structure. Portions of the original barn no longer exist.

4. The Project includes a 43-foot-tall main building with a 9,139-square-foot footprint and a 20-foot-tall, 936-square-foot residence for a farm manager/property caretaker.

5. Willowell's mission is to advance agriculture by cultivating and promoting connections between the arts, education, and the environment through land-based and agricultural educational and community activities.

6. The Project as a whole is intended to be a community center for the greater Monkton community.

7. Willowell currently uses the Project site for the Walden Project (Walden) which is an alternative outdoor education program for high school students three days per week. Willowell also conducts small agricultural and educational programs on the Project site.

8. Hartshell Co., Inc. and Perry R. Flint conveyed the Property to Willowell by warranty deed dated August 3, 2005.

9. Hartshell Co., Inc. and Perry R. Flint created the subdivision containing the Property prior to conveying the Property to Willowell. The Monkton Planning Commission approved the

2

subdivision, and the Chair of the Planning Commission (the Chair) signed the approved plat depicting the subdivision.

10. Above the Chair's signature on the plat, the plat states: "Approved by resolution of the Town of Monkton Planning Commission, Vermont, on the 28[th] day of May, 2000, subject to all requirements and conditions of said resolution."[1]

11. A written resolution or decision approving the subdivision is not in evidence, and both Appellant and Willowell assert that no such resolution or decision can be found in the Town's land records, lister's records, or planning and zoning records.

12. The Project must comply with The Unified Planning Document for the Town of Monkton, adopted February 23, 2012 (UPD). The UPD combines the Town's Zoning Regulations and Subdivision Regulations into a single planning document.

13. The Property is located within the Town's Medium Density Rural Agricultural (RA 2 MD) Zoning District.

14. The main building of the Project has a height of 43 feet measured from the average elevation of the existing grade to the ridgeline.

15. The maximum building height in the RA 2 MD District is 35 feet.

16. The existing barn is approximately 35 feet tall and the existing farm silo is approximately 48 feet and 6 inches tall measured from the average elevation of the existing grade to the highest point of the structure.

17. The Project design satisfies the latest edition of the Vermont Fire Prevention and Building Code for the type of structure proposed as well as the egress requirements of Chapter 21 NFPA 101 and Appendix 3 of the Vermont Fire and Prevention Code.

18. The Project will be in active use Monday through Friday. Willowell projects that some evening and weekend activity will occur at the Project. Evening and weekend activity

---

[1] There appears to be some confusion over when the Chair of the Planning Commission signed the plat. The copy of the plat provided to this Court as Cross-Appellant's Exhibit 1 states that the plat was approved by resolution of the Town Planning Commission on May 28, 2000. However, the signature of the Chair on the plat is dated May 28, 2002. The plat also notes that it was revised by surveyor Ronald LaRose in 2002. The 2002 plat approval appears to have been a minor revision to the 2000 approved plat. Whether the plat before the Court was approved and signed in 2000 or 2002 does not affect our conclusions in this decision.

3

would entail lectures, meetings, nature walks, art classes, and similar events, as well as annual meetings of the Willowell Board of Directors.

19. The current off-site preschool operations, located in Starksboro, Vermont, take place Monday through Friday from 8:30 a.m. to 1:30 p.m. If the Project is built, Willowell will move the preschool to the Project and may extend afternoon hours to 5:30 p.m.

20. During preschool operating hours, total attendance at the multipurpose room, library, and art gallery for non-preschool-related purposes shall be limited as follows:

    a. If preschool enrollment is 25 children or fewer; 63 attendees,

    b. If preschool enrollment is greater than 25 children; 55 attendees.

21. Willowell will not hold an event at the multipurpose room, library, or art gallery for non-preschool-related purposes if the event requires attendees to enter or leave the site between the hours of 7:00 a.m. and 9:00 a.m. or 4:00 p.m. and 6:00 p.m.

22. The existing access road, Stoney Meadow Lane, is 14 feet wide and runs approximately 430 feet from Bristol Road in an eastwardly direction across the Property. This access drive also serves four adjoining residential properties. The Project proposes to widen the road to 20 feet.

23. The existing access road is crushed stone. A paved apron is proposed in the area of the Town right-of-way adjacent to Bristol Road with the remainder of the access road being crushed stone.

24. The estimated cost for access road improvements is $22,000.

25. Willowell will assume full cost and responsibility for maintenance of Stoney Meadow Lane from Bristol Road east to the circular driveway returns.

26. Current traffic to the Project includes one bus and two support vehicles at the Project site on Mondays and Wednesdays.

27. Proposed Project traffic will include cars and school buses. Car traffic will drop off students and others as well as arrive and park on-site.

28. Site distances for the entrance and exit from the access road are greater than 500 feet. This exceeds Vermont Agency of Transportation standards.

29. The Town seeks a condition on the Project requiring construction of a new independent access roadway and curb cut located approximately 180 feet south of the existing access road.

30. The timing of AM peak hour traffic is estimated to be 7 a.m. to 9 a.m. and PM peak hour traffic is estimated to be 4 p.m. to 6 p.m. Preschool afternoon traffic may take place earlier than the PM peak hour.

31. Considering the Project traffic and the existing four single family homes using the access road, it is estimated that there will be 48 AM peak trips and 47 PM peak trips.

32. VTrans practice is to require formal traffic studies for projects generating 75 or more peak hour trips.

33. The Project includes adequate traffic circulation and access for emergency vehicles.

34. The Project will employ teachers, administrative staff, and a farm manager.

35. On-site parking will include 45 spaces. Parking will accommodate 40 students (Willowell expects only 25 students for the first five years at the Project), 9 employees (6 for Willowell and 3 for Walden), and the single family dwelling for the farm manager.

36. An overflow parking area constructed with grass pavers is proposed outside of the 60-foot right-of-way adjacent to the north side of Stoney Meadow Drive. This type of paver provides a firm base that is able to be snowplowed during the winter while also allowing grass to grow during the summer.

37. The Project's wastewater system is designed to accommodate 7 employees, 6 offices, 50 students/staff, 1 single family residence, and the multipurpose room which can accommodate 75 people.

38. The 229.8-acre Property has 1,800 feet of frontage on Bristol Road and a lot depth of approximately 400 feet. The Project is designed to provide side setbacks of greater than 530 feet, a rear setback of 50 feet, and a front setback of 55 feet or more.

39. The Project design includes collection of stormwater from impervious areas. Stormwater infrastructure includes positive drainage ditches running to the northeast. There are four bays to act as sediment filters as well as a detention area.

5

40. Even though the Project does not trigger Vermont Stormwater Management Regulations, the Project has been designed to comply with these state stormwater regulations.

41. The volume of stormwater leaving the site following Project construction will be less than or equal to current volumes.

42. The access road will be crowned so surface water will run off into ditches on each side.

43. Willowell will install three 18-inch culverts under Stoney Meadow Lane to allow surface water on the south side of the access road to flow to the north side and continue to the northeast in a drainage ditch. The three proposed culverts would accommodate a 25-year storm event.

44. Stormwater ditches or swales are designed to allow farm implements to cross. During Willowell's presentation of evidence, it agreed to increase the design of these swales to accommodate a 25-year storm event.

45. Lighting for the Project parking areas is solar-powered and equipped with timers. Two pole-mounted lights are located in the parking area associated with the driving circle. These lights are down-shielded. There is no lighting proposed for the overflow parking area to the north of the access drive. Project lighting complies with the Dark Skies Initiatives.

46. The lighting for the building entrances and the interior lighting are activated with motion sensors.

47. All exterior lighting will be powered off once activity at the Project ceases each day.

48. Project lighting will be designed to allow for manual adjustments to meet specific event lighting needs.

49. Project signage includes a free standing sign located 20 feet away from Bristol Road. This sign will be a maximum of 8 square feet. Additional signage will be flush mounted on the west-facing building wall.

50. The area of Monkton, and the Town generally, includes open agricultural land and fields and low-density agricultural, residential, and other compatible uses including limited commercial uses.

51. Monkton area farms, and farms in Vermont generally, have barns situated in close proximity to roads. If there is more than one farm structure on a property, the structures are commonly densely grouped together. It is common for support facilities to be located close to the barn structure.

52. Modern Vermont agricultural structures have a boxy mass with steep pitched roofs. Many have gabled rooflines.

53. Farm structures in the area of the Project are located parallel to the nearby road, have silos at the back of the structures, and have similar building heights to the Project.

54. The Project is immediately surrounded by open land and a modern development pattern that is transitioning from farm to town-center use, including individual residences, small clusters of residences, and farming properties.

55. The area is generally low density and includes home-based businesses.

56. Driving from the south and heading north on Bristol Road, views of the project will include a side view of the Farm Manager's house in the foreground, with the main building behind it. The large silo is located on the northerly side of the main building but is still prominent in views of the project from this direction. The main building and the silo will both give a strong impression of a traditional Vermont farm, while the multipurpose room, off the east side of the building and facing away from Bristol Road, is more modern in nature.

57. Driving from the north and heading south on Bristol Road, one will see the second story deck off of the main building, the silo, and the multipurpose room. Similarly, both the size and shape of the main building as well as the silo will give the impression of an agricultural use while the deck and multipurpose room will not. When the Project is viewed from Bristol Road directly in front of the Project, the multipurpose room is screened by the main building.

58. Views of the Project from the Lot 5 (Higbee/Knauth) residence will likely include the second floor deck of the Project. The second floor deck is approximately 13 feet above the ground level. An average height adult standing on the deck will reach approximately 19 or 20 feet above ground surface. Landscaping is proposed to soften these views of the project.

7

59. Views of the Project from Lots 2 and 3 will likely be of proposed vegetative screening and possible views of the farm silo and ridge of the roofline of the Project's main building.

60. The shape of the Project's multipurpose room has a likeness to an agricultural shed structure. Glass walls provide natural light to inside users. The east facing wall is composed mostly of glazed windows for the comfort of occupants inside the room. The room is approximately 23 feet tall and will be 16 to 18 feet above the finished grade or approximately 25 feet above present grade.

61. There are no barns or other agricultural structures in the area having large glass walls similar to the multipurpose room.

62. The multipurpose room was placed on the east side of the main structure to keep it from facing Bristol Road.

63. Large automatic top-to-bottom shades or curtains will be installed for the multipurpose room windows. These shades will be "black-out" style to mitigate nighttime lighting impacts on surrounding land uses.

64. Landscaping has been designed and proposed to soften views of the Project from neighboring residences, especially views of the multipurpose room.

65. White cedar trees and white birch trees will be planted along the eastern Property boundary south and north of Stoney Meadow Lane. Laurel understory will supplement the cedar and birch plantings. The intent is for continuous planting along the eastern property boundary.

66. White cedar trees have a mature height of approximately 15 feet. White birch trees have a mature height of approximately 18 feet. These trees will be 4 to 8 feet tall at planting.

67. Willowell will install landscaping along the eastern boundary as shown on Exhibit 13A, except that the five red maple trees shown to the east of the greenhouses will not be included. These red maple trees will cast shadows on the greenhouses, and therefore, they will not be a part of the landscaping plan. The landscaping shown on the north and south sides of Stoney Meadow Lane will be included. The three maple trees shown east of Willowell's eastern boundary and north of Stoney Meadow Lane (on the Higbee/Knauth lot) will be included so long as the land owners consent to their planting. Additional

8

plantings along the eastern property boundary shown in blue pen on Exhibit 13A are included and are a continuation of the plantings along the eastern property boundary to the south of Stoney Meadow Lane. The landscaping design in this area provides lower, middle, and upper stages of foliage imitating a natural feel. Some breaks in the vegetation allow for a natural landscape view looking west.

68. No new landscaping is proposed along Monkton Road because traditional farm properties do not generally have landscaping between the structure and the road.

69. The south side of Stony Meadow Lane is landscaped as shown on Exhibit 13 to reduce the visual impact of the Project, to shield or soften views of the Project, and to create visual interest in the foreground of the Project.

70. The Project includes a 936-square-foot single family residence for the use of the farm manager who will live on the premises and serve as a caretaker for the property. We refer to this single family residence as the Farm Manager's house. The Farm Manager's house is proposed to be located to the south of the main project building, the same distance from Bristol Road.

71. The area of land where Willowell proposes to locate the Farm Manager's house has previously been disturbed and thus, the agricultural quality of the soil in this specific area has been compromised.

72. The Project has renewable energy features, including photovoltaic solar panels for electricity generation near the driving circle, and rainwater collection.

73. There are at least two properties in the area having farm structures that have undergone renovations for adaptive new uses. These farm structures are now used for business use.

74. The closest road intersection to the Property is Prison Hollow Road and Bristol Road approximately one mile north.

75. Richard Wolak has lived at 368 Stoney Meadow Lane for approximately 11 years. He has views of Hogback Mountain from his property. From his house, he can hear traffic on Bristol Road.

76. Now and then, Mr. Wolak waits for a bus to exit the property. Rarely does Mr. Wolak ever wait behind a car to exit Stoney Meadow Lane. It is typical at the end of a school day

for his two children to walk from Monkton Road east on Stoney Meadow Lane to their house.

77. Darrel Duffy has lived on Stoney Meadow Lane for approximately 11 years. He is self-employed and works from home.

78. Sheryl Knauth and Andrew Higbee, Jr. moved to their Stoney Meadow Lane house in 2011.

79. Samuel Burr lives at 2246 Tyler Bridge Road in Monkton. He owns additional land adjoining the Project to the southeast. His adjoining property is about 0.2 miles from the Project building and approximately 2,000 feet from the waste water mound system.

## Discussion

### I. Pre-Trial Motions

At the beginning of trial, the Court addressed several pending pre-trial motions. The parties were given an opportunity to provide brief oral argument on each motion. The Court ruled on each motion on the record. For the benefit of the parties, we summarize our findings and conclusions for each motion here. Anyone wishing to review the Court's Findings and Conclusions for each motion should review the record of the trial.

Motion to Dismiss Mr. Burr, Mr. Higbee, and Ms. Knauth:

The first motion was Willowell's motion to dismiss Mr. Burr on the grounds that he did not meet the statutory requirements to qualify as an interested person in the pending appeal. An interested person who has participated in a municipal regulatory proceeding may appeal a DRB decision to this Court. 24 V.S.A. § 4471. Pursuant to 24 V.S.A. § 4465(b), as applicable here, an "interested person" is one of the following:

(1) A person owning title to property . . . who alleges that the bylaw imposes on the property unreasonable or inappropriate restrictions of present or potential use under the particular circumstances of the case.
(2) . . .
(3) A person owning or occupying property in the immediate neighborhood of a property that is the subject of any decision or act taken under this chapter, who can <u>demonstrate a physical or environmental impact on the person's interest</u> under the criteria reviewed, and who alleges that the decision or act, if confirmed, will not be in accord with the policies, purposes, or terms of the plan or bylaw of the municipality.

(emphasis added).

10

Willowell argued that Mr. Burr had not demonstrated a physical or environmental impact to any of his interests that would be caused by Willowell's proposed project. In his pleadings in response to Willowell's motion, Mr. Burr does not assert any physical or environmental impact to his interest. No such offer was made during oral argument. Mr. Burr suggested that because Willowell's motion was filed on the eve of trial rather than earlier in the proceeding, Willowell waived its right to challenge his party status. This Court has recognized, however, that "a party's standing or party status may be raised at any time." In re 114 Coll. St. Permit Amendment, No. 227-09-06 Vtec, slip op. at 2 (Vt. Envtl. Ct. Dec. 14, 2007) (Wright, J.). We therefore concluded that Willowell had not waived its right to challenge Mr. Burr's party status.

Because Mr. Burr failed to demonstrate a physical or environmental impact on his interest as required by 24 V.S.A. § 4465(b)(3), we **GRANTED** Willowell's Motion to Dismiss Mr. Burr from this matter.

Motion To Dismiss Mr. Higbee and Ms. Knauth

Willowell also moved to dismiss Mr. Higbee and Ms. Knauth. In its motion to dismiss Mr. Higbee and Ms. Knauth, Willowell asserted that these individuals did not participate in the municipal proceedings below; specifically, they did not attend or provide oral or written testimony to the municipality. Willowell acknowledges that Mr. Higbee and Ms. Knauth did timely appear before the Court through the notice of appearance of their lawyer, Philip Woodword, Esq.

As a general rule, statutes regulating appeal rights are remedial in nature and therefore "are to be liberally construed in favor of persons exercising those rights . . . ." Casella Constr., Inc. v. Dep't of Taxes, 2005 VT 18, ¶ 5, 178 Vt. 61 (citations and internal quotation marks omitted). Furthermore, it is well settled that "our primary objective in construing a statute is to effectuate the intent of the Legislature." Springfield Terminal Ry. Co. v. Agency of Transp., 174 Vt. 341, 346 (2002). We presume that the Legislature "intended the plain, ordinary meaning of the adopted statutory language," and where unambiguous "we accept that plain meaning . . . and our inquiry proceeds no further." Id. (citations omitted). We also presume that the Legislature intended for the statutory language to render results that are not absurd. Craw v.

11

Dist. Court, 150 Vt. 114, 119 (1988) ("A presumption obtains against a construction that would lead to absurd results.").

We find that it is clear from the language of 24 V.S.A. § 4465 that the Legislature intended to provide standing to appeal to persons who are current landowners or occupiers of land in the immediate neighborhood of a proposed development so long as they "can demonstrate a physical or environmental impact" on their interest. Willowell does not dispute that Mr. Higbee and Ms. Knauth are interested parties under this standard.

In order to appeal a municipal decision to this Court, however, 24 V.S.A. § 4471(a) requires that an interested person participated in the municipal regulatory proceeding. While Mr. Higbee and Ms. Knauth did not participate before the municipality, their predecessors in interest in their property, John and Sandra True, did participate. The Trues' participation was related to the property now owned by Mr. Higbee and Ms. Knauth and the potential impacts thereon. The Trues transferred all of their rights in the property to Mr. Higbee and Ms. Knauth. We therefore determined that the Trues' participation was sufficient to establish participation by Mr. Higbee and Ms. Knauth because the owners of the property that gives rise to interested person status participated in the municipal proceedings at the time of those proceedings.[2]

Mr. Higbee and Ms. Knauth filed their Notice of Appearance on November 13, 2012, 20 days after Mr. Burr's Notice of Appeal and 19 days after Willowell's Notice of Appeal. Thus, pursuant to Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 5(d)(2), since Mr. Higbee and Ms. Knauth appeared within 20 days, they are accorded party status absent the Court dismissing them upon a motion to dismiss. Because we **DENIED** the motion to dismiss them as parties at the start of trial, Mr. Higbee and Ms. Knauth are proper parties before this court.

Pursuant to V.R.E.C.P. 5(b)(2), following a timely notice of appeal, any other person entitled to appeal may file a notice of appeal. Each party filing a notice of appeal must, within

---

[2] Furthermore, disallowing the appeal of Mr. Higbee and Ms. Knauth would result in manifest injustice, and therefore participation is not required of them under 10 V.S.A. § 8504(b)(2)(C). The Trues participated in the municipal proceedings but have no standing because they no longer have any interest in property in the neighborhood of the proposed development. Mr. Higbee and Ms. Knauth had no interest in the property to protect during the municipal proceeding. To prevent Mr. Higbee and Ms. Knauth from appealing to this Court would eliminate a valid right of the owner of this neighboring property to protect this property interest from potential adverse effects.

12

20 days of filing their notice, file a statement of questions that they desire to have determined by the Court.  See V.R.E.C.P. 5(f).  An appeal to the Environmental Division is confined to issues raised in the statement(s) of questions.  V.R.E.C.P. 5(f); In re Garen, 174 Vt. 151, 156 (2002).

In response to Willowell's Motion to Dismiss Mr. Burr's appeal, Mr. Higbee and Ms. Knauth requested that upon dismissal of Mr. Burr, the Court order that they be allowed to continue this appeal under Mr. Burr's Statement of Questions.  Mr. Higbee and Ms. Knauth have the ability to continue this matter even though Mr. Burr, as the original appellant, is dismissed from this appeal.  Where intervention is timely, is not sought for an improper purpose, such as curing a jurisdictional defect, and is done simply to protect the interests of the intervening party, a court should not dismiss an appeal simply because the original appellant is unable or unwilling to proceed with the case.  See In re Garen, 174 Vt. at 153–54 (allowing interested parties to continue with appeal to Environmental Court after original appellant withdrew from appeal).  Holding otherwise could produce a burdensome result because following the original notice of appeal all subsequent appearing parties would have to file a notice of appeal and pay a filing fee to ensure the appeal is carried forward in the event the initial appellant is dismissed or withdraws.  This would be an absurd procedural practice.  Here, Mr. Higbee and Ms. Knauth filed their notice of appearance 20 days after Mr. Burr's notice of appeal, and there is no showing that the appearance was untimely or otherwise improper.  Thus, as subsequently appearing parties, Mr. Higbee and Ms. Knauth may continue with the initial appeal and Statement of Questions.  Because they did not file their own cross-appeal and Statement of Questions, Mr. Higbee and Ms. Knauth cannot raise additional questions.

Thus, on the record before the Court we **DENIED** Willowell's Motion to Dismiss Mr. Higbee and Ms. Knauth.  As such, we concluded that they remain parties before the Court and may be heard on Mr. Burr's and Willowell's Statements of Questions.  Lastly, we noted that although Mr. Burr is dismissed as an appellant, he may participate as a witness for Mr. Higbee and Ms. Knauth.  Following a short recess, Attorney Runcie verbally moved to appear as co-counsel for Mr. Higbee and Ms. Knauth.  As there was no objection from Willowell or the Town, the Court recognized Attorney Runcie's verbal appearance.

13

Motion to Dismiss Certain Questions

Willowell also moved pre-trial to dismiss certain questions in Mr. Burr's Statement of Questions relating to the Project's septic system on the grounds that such issues are subject to the authority of the Vermont Agency of Natural Resources (ANR), not the Town of Monkton. There is often some permissible overlap or similarity between those issues regulated by the ANR and issues regulated by municipalities. We therefore **DENIED** the motion to dismiss any of Mr. Burr's questions because a complete preclusion of evidence related to those questions could exclude admissible evidence relevant to the issues properly before the Court. We did, however, invite parties to object to any testimony or evidence offered on topics beyond the jurisdiction of the Court in this municipal appeal at the time such evidence or testimony was solicited or moved for admission.

Motion in Limine

Willowell filed a motion in limine asking the Court to preclude evidence of "Agricultural Reserves" or "Building Envelopes." We **DENIED** the motion, finding a distinction between admissible evidence, that being relevant to the application before the Court, and the earlier rejected argument that the Willowell property is subject to land use restrictions allegedly contained in a subdivision approval that no party can produce. Thus, while the Court determined that it would not infer land use restrictions absent a decision imposing them, evidence regarding the property proposed to be developed would not be excluded. In so ruling, we again invited parties to object to any testimony or evidence offered on topics beyond the jurisdiction of the Court in this municipal appeal at the time that testimony or evidence was solicited are moved for admission.

II. **Summary of Neighbors' Testimony and Preliminary Issues Regarding Scope of the Court's Review**

Before addressing the questions raised in Mr. Burr's and Willowell's Statements of Questions, we summarize the testimony of the neighbors who testified during our merits hearing. This testimony touched on many of the issues before the Court.

Richard Wolak likes the open land and views of Hogback Mountain. From his house, he can hear traffic on Bristol Road. In the summertime, after the hay fields are cut, the traffic

noise is louder. He enjoys the panoramic views while driving south on Monkton Road in the area of the Project.

Mr. Wolak believes that the present traffic on Stoney Meadow Lane is minimal. Now and then, Mr. Wolak waits for a bus to exit the property. Rarely does Mr. Wolak ever wait behind a car to exit Stoney Meadow Lane. It is typical at the end of a school day for his two children to walk from Monkton Road east on Stoney Meadow Lane to their house. Present day impacts from Willowell's use of the Project site include noise from children on the property. Mr. Wolak thinks the Project will change the aesthetics of the area because his views to the west will include more structures. He is also concerned with lights, noise, traffic, and safety for his children on Stoney Meadow Lane. He is concerned with runoff from the mound system. He is also concerned with traffic and parking for large events.

Mr. Wolak does not want the Farm Manager's house moved to the eastern boundary because it would be close to his house, potentially casting shadows on his property and leading to high visibility among neighbors.

Darrel Duffy finds the neighborhood to be quiet and dark. He thinks the traffic on Bristol Road is moderate. Mr. Duffy likes the idea of a new second independent access road for the Project. He thinks Project lighting, including car lights, will be an impact to the character of the area. He is concerned with surface water runoff.

Sheryl Knauth and Andrew Higbee, Jr. enjoy the peace, open space, and little traffic in the neighborhood. Ms. Knauth is concerned with the multipurpose room and second level deck which will both be viewable from her front porch. She believes that these features impede on her privacy. Ms. Knauth is also concerned with lights from the multipurpose room and with additional stormwater run-off.

Samuel Burr believes that the Project will diminish the agricultural use of the subject Property. Mr. Burr considers the area of the Project to be the "entrance way" to Monkton. Mr. Burr believes that the Project will create an adverse impact to the aesthetic experience of the area.

We refer to Ms. Knauth, Mr. Higbee, Mr. Burr, Mr. Wolak and Mr. Duffy collectively as "neighbors."

A.       Questions Raised Concerning Subdivision Permitting

Mr. Burr's Statement of Questions raises several questions related to prior subdivision permitting.  These questions are as follows:

1.  Should Willowell receive conditional use approval when several aspects of its application violate the terms of subdivision approval granted to Hartshell Co. Inc., and Perry R. Flint by the Monkton Planning Commission?
2.  . . .
3.  Should the applicants be permitted to create a new 30' access road off Monkton Road to Bristol road, when the above subdivision permit directs that access to Lot 6, other than for a single for a family [sic] dwelling, be by right of way off Prison Hollow Road?
4.  . . .
5.  Should the septic system of the caretaker's residence be built as indicated in the subdivision permit and in the subdivision mylar?
6.  Should the location of the proposed facility be moved and should the facility be limited in size in order for construction to comply with Monkton Town Plans and the intent of the original subdivision permit to place building envelopes for single family homes over the brow of the hill?

Willowell also raises a question relating to the prior subdivision permitting:

6.  Is there any obligation on the part of Willowell or any of its successors in title to abide by the terms of any purported past permits, restrictions, encumbrances or approvals, where no such permits, restrictions, encumbrances or approvals can be found in the Town of Monkton records, or in the subject property's chain of title.

Issues of subdivision are not before the Court.  The subdivision application, the Town's review and approval, and documentation of the decision approving the subdivision (permit) are not before the Court.  Section 4472 of Title 24 of the Vermont Statutes clearly directs that absent an appeal, subdivision approval is final as to all interested persons affected.  In this matter, we only consider the appeal of conditional use review and site plan review for the Project.  Further, the subdivision approval/permit is not in evidence as neither the original nor a copy could be located.  As addressed above, in an August 19, 2013 decision, we specifically concluded that in reviewing Willowell's Project, this Court will conduct its review according to the Town's conditional use and site plan review standards.

The subdivision plat for the property references an "Agricultural Reserve."  "Agricultural Reserve" is not defined on the plat or any other document for the subdivision approval.

16

Because we have no copy of the subdivision approval, we cannot determine the intent for this area. Mr. Burr sought to introduce evidence of documents allegedly before the Town during the subdivision review proceedings. We declined to admit this evidence because there was no enforceable condition that the Court was required to interpret.

Mr. Higbee and Ms. Knauth also argued at trial and in their post-trial memoranda that the "Agricultural Reserve" designation on the subdivision plat created a permit condition. We disagree. Because we have no document defining "Agricultural Reserve" or clearly establishing that the "Agricultural Reserve" designation was meant to be an enforceable condition, we cannot read it as such. This Court will not infer a restriction on a landowner's use of his land absent a clear indication that an enforceable condition was imposed. See In re O'Neil Sand & Gravel, No. 48-2-07 Vtec, slip op. at 7 (Vt. Envtl. Ct. Sept. 11, 2009) (Wright, J.) ("[P]ermit conditions must be sufficiently clear to provide notice of the restrictions placed on the land." (citing Handy Family Enters., 163 Vt. 476, 482 (1995)); see also In re Stowe Club Highlands, 164 Vt. 272, 277 (1995) (finding that map designating area as an "agricultural easement" was not sufficiently clear to be an enforceable condition when "unaccompanied by permit conditions"). This case is distinguishable from In re Northern Acres, LLC, 2007 VT 109, 182 Vt. 618. In that case, the final recorded plat included an area designated as "common land." This Court held that such designation was a valid permit condition and the Supreme Court affirmed. In that case, however, a document was recorded in the land records concurrently with the plat. That document clearly defined "common land" and supported the conclusion that the plat was meant to indicate a binding condition. Here, we have no such document. Thus, no permit condition exists.

With respect to Mr. Burr's Questions 1, 3, 5, and 6 and Willowell's Question 6, we conclude that absent a decision or permit imposing restrictions on the use of the subject land in the Town's land records or the Property's chain of title, Willowell need not comply with any alleged permit or conditions.

B.    Agricultural Reserve

Mr. Burr's Question 2 asks:

2.  Should any non-agriculturally related construction be permitted in the agricultural reserve, including proposed septic systems and infrastructure?

17

Similarly, Willowell's Question 7 asks:

7. Do references to "Agricultural Reserves" have the purpose and effect of restricting the use of such demarcated lands to non-structural agricultural uses or instead are they intended to give notice to prospective purchasers of the presence and proximity of agricultural uses so as to preserve the right of the owner of the subject property to farm, should they so choose? Assuming the latter to be the case, is there any basis for the Monkton Development Review Board's condition extending the so-called "southern agricultural reserve" and limiting development there? In the alternative, if references to "Agricultural Reserves" do restrict the use of the subject property, do such restrictions nonetheless allow the uses contemplated in the application?

The parties disagree as to the meaning of the term "Agricultural Reserve." We have no permit or permit condition in evidence before the Court. We will not attempt to determine the meaning of the phrase "Agricultural Reserve" without the prior decision squarely addressing the term. We will not require Willowell to prove that it complies with unknown restrictions allegedly contained in a subdivision approval that no party can produce.

C.    Building Envelopes

The parties further disagree about the legal effect of depicted "building envelopes" on the subdivision plat. In designing the Project, Willowell sought only to comply with setbacks as limits of building envelopes and not the "building envelopes" on the subdivision plat. The neighbors argue that the designation of "building envelopes" on the plat has essentially the same effect as the "agricultural reserve" designation in limiting the permissible future development on the property.

For the same reasons we concluded that "agricultural reserve" was not an enforceable condition, we also conclude that the presence of designated "building envelopes" on the recorded subdivision plat, without any recorded decision specifying the extent to which that designation was intended as a condition of approval, does not create an enforceable land use restriction. First, in addition to the problems discussed above related to the agricultural reserve, the subdivision plat is even less clear regarding the building envelopes. The dotted lines designating the "building envelopes" on the plat are unclear, as some of the lines do not close in a boxed area. Further, the "building envelopes" for the subject lot, Lot 6, are not clearly shown on any plans. Thus, based on the subdivision plat, there was no intent to

18

condition the subdivision on building within any particular building envelopes. Therefore, Willowell's development need only comply with the UPD requirements for building locations and not any alleged limitations contained in the subdivision plat.

D.      Phasing and Review of Changes to the Project

Willowell's Question 4 states:

4.  Did the Monkton Development Review Board have a sufficient legal and factual basis to approve only a first phase of Willowell's application and to require Willowell to submit to subsequent application and review processes for each later phase?

Willowell's Question 5 states:

5.  Did the Monkton Development Review Board's condition requiring Willowell to seek its re-approval of any modifications necessitated by complying with the Board's conditions to the approval render that approval illusory, arbitrary and capricious? Did the Monkton Development Review Board have sufficient legal and factual justification to impose such condition?

Willowell appears to raise these questions due to the Town's concerns about potential expansions of the Project by Willowell or a potential change between the Project as approved and how the Project is actually constructed over the coming years. First, we note that the current appeal before the Court is conducted de novo, meaning we hold a trial anew and do not review the propriety of the decisions of the DRB. 10 V.S.A. § 8504(h); see In re Cote NOV, No. 273-11-06 Vtec, slip op. at 3 (Vt. Envtl. Ct. Aug. 22, 2007) (Durkin, J) ("[T]he scope of this proceeding is limited to a de novo review . . . meaning that this Court is not charged with examining the propriety of the DRB's actions."). To the extent that either the Town or Willowell is concerned, we note that Willowell is required to construct the Project as approved herein and comply with any conditions. Any material changes to the approved Project would require additional Town review and approval. Apart from that requirement, Willowell does not need to seek any further review in constructing the Project as approved in this decision. We therefore conclude that based on the Court's decision in this de novo review, these two questions are **MOOT.**

19

**II.** **Conditional Use Review, Site Plan Review, and Conditions**

Mr. Burr's Questions 8 and 9 raise the general issue of compliance with the Town's conditional use review process. These questions state:

8. Should Willowell receive a conditional use permit?
9. If so, what conditions should be imposed?

Similarly, Willowell raises the following question:

1. Does the application of The Willowell Foundation, as applied for, satisfy the requirements of the Town of Monkton Zoning Bylaw, including its conditional use and other discretionary criteria?

At trial, the parties provided evidence on several topics relating to conditional use review. The Project is located in the Town's Medium Density Rural Agricultural (RA 2 MD) District. Section 260 of the UPD lists the permitted uses in the RA 2 MD District. These include "agricultural and forest uses," "one family dwelling," and "public outdoor recreation," among others. Section 290 of the UPD sets out conditional uses in each zoning district. Among the conditional uses for the RA 2 MD District are "Art Gallery," "Commercial Day Care Center for Children," "Community Care Center," and "Community Center." Conditional uses must be reviewed pursuant to UPD § 360, which sets out the standards for conditional use approval. Conditional uses also require site plan approval pursuant to UPD § 364. The Project contains elements of both permitted and conditional uses for the zoning district in which it is located and therefore the Project must conform to the UPD conditional use and site plan standards.[3] Additionally, the UPD requires conditional uses to comply with specific standards in Article IV and V, including: Section 536, Driveways; Section 539, Access and Safety; and Section 554, regarding exceptions to maximum allowable height. We will consider the Project's compliance with these elements in turn.

---

[3] For proposed development that is "neither specifically prohibited nor permitted nor listed" in the conditional use list, the DRB may hear the application as one for a conditional use "when in the opinion of the DRB the proposed use does not detract from the traditional rural agricultural character of the town, and is compatible with other uses" in the relevant zoning district. UPD § 290(F). Thus, even if the Project does not entirely fit within the definition of those specifically listed conditional uses, if the Court determines that if fits with the character of the town and is compatible with other uses, the Project can still be approved as a conditional use.

Conditional Use Review

Pursuant to the general conditional use standard contained in UPD § 360(C), the Project must not result in an undue adverse effect on any of the following: 1) the capacity of existing or planned community facilities; 2) the character of the area affected; 3) traffic on roadways and highways in the vicinity; 4) the bylaws and ordinances in effect; and 5) the utilization of renewable energy resources.

1) Existing and Planned Community Facilities

There was no evidence presented at trial as to any adverse effects of the Project on existing or planned community facilities.  "Community facilities" has been defined as including only "water supply, sewage disposal, fire protection, school services, recreation facilities, solid waste facilities or police protection."  In re Meaker, 156 Vt. 182, 185 (1991).  The Project will not have any adverse effect on any of these community facilities.

2) Character of the Area

The second general conditional use standard is familiar in land use regulation: the Project must not have an undue adverse effect on the character of the area.  In considering this standard, we are guided by the two-prong analysis, known as the "Quechee test," used in reviewing state land use (Act 250) permits.  See In re Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 12 (approving use of the Quechee test as guidance in defining undue adverse impacts in zoning bylaws).  Under the Quechee test,

> "[the Court first] determines if the proposed project will have an adverse . . . impact, and if so, it considers whether the adverse impact would be undue.  An adverse impact is considered undue if any one of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard . . . ; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings."

In re Times & Seasons, LLC, 2008 VT 7, ¶ 8, 183 Vt. 336 (citations omitted).

In designing the Project, Willowell gave consideration to past and existing farm structures on-site and in the area.  The Project will continue the use of on-site structures relating to farming and agriculture.  Attempts were made to keep new structures away from adjoining neighbors.  The proposed structure is similar to the former barn that partially remains

21

on the property, except portions of the former barn were closer to the road and the former barn was larger. The barn on the property is being retained and relocated on the Project site. The Project is designed to keep and include the farm silo as well as silo bases that no longer have silos.

The Project will preserve significant open space and continue agricultural uses including gardens and hoop houses. Additionally, the Project incorporates structures, including the relocated barn, the existing silo, and a new goat shed, that continue a trend of rural agricultural use.

Overall, the Project matches traditional Vermont farm developments. Certain Project elements, however, are modern and commercial in nature. Specifically, the large mostly glass multipurpose room and two decks on the main structure are not typical of agricultural barns. The Project will be larger in size than the prior farm development. Furthermore, the Court recognizes that the immediate neighborhood is primarily composed of single family residences. Thus, there will be some adverse effect on the character of the area caused by the Project.

Although we conclude that the Project will have an adverse effect on the character of the area, this impact is not undue. First, we cannot say that the project violates any clear written community standards. We do find evidence that the Town of Monkton, through the Monkton Development Plan (Town Plan), seeks to encourage preservation of agricultural lands, open spaces, panoramic views, and valuable natural resources. Town Plan at 6. The UPD § 230(B) states that the RA 2 MD District has "historically been deemed suitable for residential and commercial uses." Furthermore, the Town Plan states that the RA 2 MD District should be used for "agricultural, residential, limited light commercial[,] and other compatible and complementing uses." Town Plan at 56. The Project fits within these standards.

Second, the Project will not offend the sensibilities of the average person. While the neighbors are concerned about the size of the building and its alleged non-compatibility with surrounding uses, they did not provide evidence that the Project would be shocking or offensive to an average person.

Finally, Willowell has taken reasonably available mitigating steps to improve the harmony between the Project and the surrounding area. The Project is designed to incorporate

many qualities of Vermont farm structures. The landscaping plan described in ¶¶ 64–69 of our Findings of Fact will significantly mitigate negative impacts to the views from neighboring properties. All project lighting will be "Dark Skies" compliant and will therefore mitigate any potential light pollution. Furthermore, the glass multipurpose room will have full shades to reduce or prevent nighttime light glow from the Project when the multipurpose room is in use. Willowell proposes to locate the Farm Manager's house where agricultural soils have already been impacted, minimizing additional impacts on agricultural soils. While the Town and the neighbors suggest other changes to the proposed project, we find that Willowell has taken all reasonably available mitigating measures. The suggested relocation of the Project access and the limitation on the building height are specifically addressed below. We therefore conclude that the Project will not have an undue adverse effect on the character of the area.

3) <u>Traffic on Roadways and Highways</u>

The Project must also comply with the general conditional use requirement that the Project not have an undue adverse effect on traffic on roadways and highways in the vicinity and the UPD's specific standards regarding driveways and access and safety. Willowell proposes a one-way driving circle off of Stoney Meadow Lane. It is undisputed that the Project will increase traffic on Stoney Meadow Lane and turning traffic onto Stoney Meadow Lane from Bristol Road. A total of 48 trips are projected on Stoney Meadow Lane during the AM peak hour, and 47 trips are projected during the PM peak hour. The neighbors called Anthony T. Stout, a consulting land use planner, to testify. Mr. Stout generally agreed with Willowell's traffic evidence. Mr. Stout noted that school traffic might have a shorter and sharper peak with a condensed time period as all vehicles would enter and exit at the same two times, at the beginning and end of the school day. Although the Project may have a greater impact on the neighbors than the existing use and traffic level on the access drive, Mr. Stout provided no persuasive evidence that as proposed, with Willowell's improvements, Stoney Meadow Lane will be unreasonably congested or unsafe. Although the projected traffic represents a substantial increase over existing traffic, it will not have an undue adverse effect on traffic in the vicinity.

23

Willowell agrees to a condition requiring it to widen the access road to 20 feet and accept responsibility for maintaining the 430 feet of access road from the intersection of Bristol Road and Stoney Meadow Lane, across the Property to the circle where the four residential driveways return to Stoney Meadow Lane. Willowell also agrees to a condition requiring a performance bond of $25,000 to secure access road improvements. While the neighbors raised concerns that the Project will worsen traffic on Stoney Meadow Lane, there was no indication that the Project, along with Willowell's access road improvements, will have an undue adverse effect on traffic. We also find that the proposed Project access complies with the UPD.

The Town seeks a condition on the Project requiring construction of a new independent access roadway and curb cut located approximately 180 feet south of the existing access road. If so conditioned, the Project would be accessed exclusively from this new driveway and not from Stoney Meadow Lane. This proposed access drive would run between the Project building and other Project features, requiring students and others to cross the new drive for on-site activities and resulting in an unwarranted increase in safety concerns for the users of the Project. Furthermore, the alternative access road suggested by the Town and neighbors is inconsistent with the character of the area, as properties typically have only one access drive. Two drives would also increase the impervious surface area, decrease safety for pedestrians, and require the relocation of the parking area into agricultural soils. The proposal is generally contrary to Willowell's mission to protect and conserve agricultural soils. We find no reason to create another curb cut and access to Bristol Road unless necessary. With the road improvements Willowell has agreed to undertake, access to the Project by Stoney Meadow Lane will not have any undue adverse impacts on traffic or traffic safety. Thus, adding an additional drive, with an additional curb cut near Stoney Meadow Lane, is unwarranted.

We conclude that the Project as proposed will have no undue adverse effect on traffic on roadways and highways in the area and will comply with all provisions of the UPD related to traffic, driveways, and access and safety.

4) Bylaws and Ordinances and Renewable Energy

The final two general conditional use standards require that the Project not have an undue adverse effect on the bylaws or ordinances in effect or the utilization of renewable

24

energy resources. The Project will not have any adverse effects on either of these criteria. The Project fits within the requirements of the UPD as described in this decision. The Project does not negatively impact any person's ability to utilize renewable energy and in fact the Project implements solar photovoltaic power in its design.

Performance Bond

Mr. Burr's Question 7 asks:

7. What bond should be required sufficient to guarantee that the applicant will be able to complete the construction in timely and competent matter [sic] without putting the neighbors or town at risk?

Willowell's Question 2 and 3 ask:

2. Should Willowell's proposed use of the existing road have been approved and did the Monkton Development Review Board have a sufficient legal and factual basis to require Willowell to construct a new road?

3. Did the Monkton Development Review Board have a sufficient legal and factual basis to require a performance bond?

UPD § 360(G) provides that the "[DRB] may require that the applicant furnish the town with a performance bond up to the value of the cost of the work/improvement to be guaranteed by such bond" in order to assure the proper development of the conditional use. Willowell introduced evidence that its proposed improvement of Stoney Meadow Lane will cost approximately $22,000. Because Stoney Meadow Lane serves as access to four existing residential properties, we conclude that it is reasonable to require a performance bond to ensure that the road is constructed properly and to ensure that the residential properties using Stoney Meadow Lane will continue to have appropriate access. Thus, we impose a performance bond of $25,000 to secure the proper and timely improvement of Stoney Meadow Lane.[4] We see no reason to impose any other bond requirements on Willowell.

**Site Plan Review**

As mentioned above, the UPD also requires all conditional uses to undergo site plan review. Beyond the general standards in conditional use review, site plan review requires that

---

[4] During the merits hearing, Willowell agreed to a performance bond in this amount for this purpose.

the Project will have adequate circulation and parking; adequate landscaping and screening; lighting that will not have an undue adverse impact on neighboring properties; appropriate location, design, and size of signs; no flooding or ponding; and no undue adverse impact on important nearby natural features. UPD § 364(C)(1)–(7). Site plan review also requires that utilization of renewable energy resources is protected, that continued use of existing historic structures is encouraged, that the appearance and visual context of historic structures are maintained, and that the size, scale, arrangement, and appearance of the proposed development is in keeping and harmonious with its surroundings. UPD § 364(C)(8)–(10).

1) Circulation and Parking

The regulations do not require a specific number of spaces relative to the size of the Project. Rather, the UPD only requires "adequate" parking. Willowell's expert suggested that applying standards in the Institute of Transportation Engineers Traffic Generation Handbook, and considering the Project as a school use, a minimum of 10 spaces for 40 students (the maximum capacity), 8 additional spaces for employees, and 2 spaces for the Farm Manager's house would be required. The Project design has sufficient parking for 45 vehicles. The Project design also includes overflow field parking for the rare occasions requiring additional parking for special events. We therefore conclude that in addition to the adequate circulation discussed in the conditional use review above, the proposed parking is adequate.

2) Landscaping and Lighting

As discussed above, the Project includes sufficient landscaping to mitigate potential impacts on views from neighboring properties. The landscaping described in ¶¶ 64–69 of the Court's Findings of Fact will provide both adequate landscaping and screening. As also noted above, Project lighting will be "Dark Skies" compliant. Exterior lighting will be downcast and shielded, and both interior and exterior lighting will be on timers or utilize other sensors to ensure that lighting is off when the Project is not in use. The Project uses the minimum lighting necessary to illuminate the primary parking area. The overflow parking area will not have exterior lighting. Additionally, Willowell has agreed to install full shades in the glass-walled multipurpose room in order to minimize any light emitting from the multipurpose room when

26

used at night. We therefore conclude that the Project complies with the site plan regulations related to landscaping and lighting.

3) Signs

Project signage includes a free standing sign located 20 feet away from Bristol Road. This sign will be a maximum of 8 square feet. Additional, unlit signage will be flush mounted on the west-facing building wall. The proposed signage complies with the dimension and location requirements of UPD § 572 and is appropriate

4) Surface Water Flooding or Ponding

Mr. Burr's Question 4 relates to impacts by the project on water resources in the area. It asks:

4. Should any permit that may be issued address concerns relating to surface runoff, location and design of proposed retention pond, location of septic system and drainage of proposed parking areas?

Pursuant to the Town's site plan review, UPD § 364(C)(7), the DRB, and therefore this Court on appeal, may consider appropriate conditions to ensure that the Project is free from flooding and ponding. Although the Project does not trigger the need for state level stormwater permitting, the Project has been designed to meet these state regulations. Based upon our Findings of Fact ¶¶ 39–44, we conclude that as proposed, and as modified during our merits hearing, the Project is free from flooding and ponding. We therefore conclude that the project complies with UPD § 364(C)(7).

5) Important Natural Features, Renewable Energy Resources, Historic Structures, and Harmony with Surroundings

The Court concludes that the Project as proposed will not have an undue adverse impact on important natural features located on or near the parcel. The Project does not impact the utilization of renewable energy resources, and in fact incorporates solar power features. Finally, the project maintains portions of the historic barn structure and, as discussed in detail above, the proposed construction is in keeping and harmonious with the Project's surroundings, despite certain modern features.

Farm Manager's House

The Town seeks a condition requiring that the Farm Manager's house be moved to a building envelope on the south side of the existing access road near the Property's east boundary.

Willowell proposes to locate the Project's main building in an area where the soil has already been disturbed. Locating the Farm Manager's house in closer proximity to the main building is less likely to impact agricultural soils on the Property. Further, placing the single family house near the main building is consistent with historic development patterns of farm buildings clustered together and close to the road. Because this location complies with the UPD and will not cause any undue adverse effect on the character of the area, we find no legal justification for requiring Willowell to move it. We conclude that the Farm Manager's house is best located south of the main building on the western side of the Project site in close proximity to Bristol Road.

Height

Section 554 of the UPD allows for a height exception by conditional use:

No building may be greater than two stories or 35 feet, unless it has been granted a conditional use permit by the Development Review Board. In order to secure a conditional use permit, in addition to the general requirements, the applicant will need to demonstrate that the structure will be constructed so as to satisfy the latest edition of the Vermont Fire Prevention and Building Code for the type of structure proposed as well as the egress requirements of Chapter 21 NFPA 101 and Appendix 3 of the Vermont Fire and Prevention code.

First, it is undisputed that the Project satisfies the latest edition of the Vermont Fire Prevention and Building Code for the type of structure proposed as well as the egress requirements of Chapter 21 NFPA 101 and Appendix 3 of the Vermont Fire and Prevention code.

The proposed height of the building is 43 feet. The existing silo which is incorporated into the Project design is 48 feet tall. The Town suggests the Court limit the height of the building to 40 feet in order to maintain the traditional appearance of barns, with roofs at a lower height than silos. Lowering the building height would change the aesthetics of the building considerably. The steep gabled roofline appearance would be lost, and the building

28

would lose its traditional Vermont barn character.  The decrease in three feet, however, would not significantly change the building's impact on views.  We conclude that the proposed height of the Project's main building in excess of the maximum permitted height in the district satisfies the UPD.

## Conclusion

Willowell's Project, as described and conditioned in this decision, complies with the conditional use and site plan requirements of the Town of Monkton Unified Planning Document.  As described in this decision, the parties and their experts modified and supplemented the Project, especially the Project's landscaping, during our multi-day trial.  To ensure compliance with this approval now and in the future, we require that Willowell file with the Town Zoning Administrator a revised site plan fully consistent with this decision, conditions herein, and condition 3 imposed by the DRB's September 27, 2012 decision.  Conditions 1, 2, 4, 5, and 6 of the DRB's September 27 decision are VOIDED.  The revised site plan shall be filed within 30 days of this decision with a copy served on all parties to this matter.  Upon receipt of the revised site plan, we direct that the Zoning Administrator issue a zoning permit consistent with this decision.

A Judgment Order accompanies this Decision.  This completes the current proceedings before this Court.

Electronically signed on July 10, 2014 at 10:09 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division

29